Filed 5/15/24  P. v. West CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SANTANA DUANE WEST,<br><br>    Defendant and Appellant. | A164873<br><br>(San Francisco City & County Super. Ct. Nos. SCN226436, CRI-14031086) |

Santana Duane West[1] appeals after a jury convicted him of forcible rape (Pen. Code, § 261, subd. (a)(2); count one),[2] sexual battery by restraint (§ 243.4, subd. (a); count six), two counts of assault with force likely to cause great bodily injury (§ 245, subd. (a)(4); counts eight-nine), false imprisonment (§ 236; count 11), and assault with intent to commit rape (§ 220, subd. (a)(1); a lesser included offense of count five).  The jury also found true a prior conviction allegation, which was alleged as a qualifying prior under the one strike law (§ 667.61, subds. (a), (c)(1), (d)(1)) and the habitual sexual offender law (§ 667.71, subds. (a), (c)(1)).  That conviction (along with two others) were also alleged as

---

[1] The parties stipulated below that appellant's birth name is Elon Collins, but he was charged as Santana Duane West and is therefore referred to as West throughout this opinion.

[2] Undesignated statutory references are to the Penal Code.

1

qualifying prior strikes under the three strikes law (§§ 667, subds. (d)-(e), 1170.12, subds. (b)-(c)).

After a bifurcated court trial, at which the trial court found all three prior strike allegations true, West was sentenced to a prison term of 75 years to life. On appeal, West asserts claims of evidentiary, prosecutorial, and sentencing error. We find no prejudicial error and affirm.

## BACKGROUND

### A.

At around noon on December 2, 2014, Catherine S. went out to buy crack in the Tenderloin neighborhood of San Francisco. Although she had smoked crack earlier in the day, she was no longer feeling its effects. She met West, who said he had drugs and asked Catherine if she wanted to get high. Catherine agreed and invited West to her apartment to smoke. Catherine testified that she and West did not discuss exchanging sex for crack.

On their walk to Catherine's apartment, West was drinking liquor. Catherine did not drink any alcohol with him, but she had consumed some earlier in the day. They entered her apartment, Catherine gave West a pipe, and he "took a hit."

Immediately thereafter, and within five minutes of entering the apartment, West punched Catherine in the face, knocking her onto the bed. He said, "[t]ake off your clothes, bitch," and punched her again. Catherine was a cancer survivor and had not had sex in years. Catherine told him this and that she "can't do nothing." West responded that she was lying and claimed he had a nine-millimeter gun. Although Catherine never saw a gun, West said several times that he would "kill" or "shoot" her if she did not comply.

As Catherine struggled on the bed with West, she tried to bang on the wall (adjacent to an exterior hallway) to get

2

someone's attention. But West then held her hands and pressed a pillow down over her face. Catherine testified that she thought she was "going to die." When he removed the pillow, Catherine said, "[O]kay man I quit. I quit. I quit." West then penetrated Catherine's vagina with his penis.

Eventually, West stopped and went into Catherine's kitchen in search of food. Catherine testified that he then hit her several more times, threatened to kill her, and forcibly had sexual intercourse with her two or three more times. Over the course of the entire attack, which lasted between five and six hours, West pushed the pillow over her face three or four times. He also used his hands to cover her mouth and nose, and he strangled her—using both of his hands around her neck to hold her down. After a final act of forced intercourse, West fell asleep in Catherine's bed. Catherine then ran to her neighbor's apartment and called the police to report being raped.

**B.**

Catherine's neighbor (and friend) testified that, on the evening of December 2, 2014, Catherine knocked on his door and said she had been "violated." Catherine's eyes were puffy, and she appeared "shaken up."

San Francisco Police Department Officer Irving Garcia, Jr. responded to Catherine's apartment building that night. When Officer Garcia met Catherine in the hallway, she was wearing only a jacket, with nothing on underneath. Catherine—who did not appear to be under the influence of cocaine—initially told Garcia, "he beat me up" and that her assailant was still in her apartment. She appeared frightened, agitated, and disheveled and had observable injuries to her face (including eyes, chin, lip, and jaw), as well as to her neck, shoulder, and arm.

When Officer Garcia entered Catherine's apartment, he found West asleep, in her bed, wearing a white shirt but nothing

3

else.  Spots of blood were on West's shirt.  When asked about it, West said he thought he had a cut on his finger.  While Officer Garcia remained with West, a transmission on the police radio referenced an ambulance for "a possible 261 victim."  West immediately stated, " 'I did not have sexual relations with this woman.  I know what 261 means.' "

Officer Garcia returned to the hallway to interview Catherine.  Catherine told him that, when she first met West around noon, West offered her crack, and they went back to her apartment to get high.  Catherine said that she never actually ingested any drugs because, once they arrived at her apartment, West beat her, raped her three or four times, and she only escaped when West fell asleep.

Crime scene investigators did not find a gun in Catherine's apartment, but they collected a bra, which had an apparent blood stain on it.  Her mattress and nearby wall also showed what appeared to be blood.

## C.

Catherine was examined by a nurse practitioner at San Francisco General Hospital.  The nurse practitioner testified as an expert in conducting forensic sexual assault examinations and in the identification of symptoms of strangulation.

When Catherine was examined, she was crying but did not appear to be intoxicated.  She had a bruise on her left shoulder, scratches on both arms and her face, swelling around her eyes, and bruising around her eyelids, forehead, and lips.  Both of Catherine's eyes showed recent subconjunctival hemorrhages and her voice was hoarse.  The nurse practitioner opined that these injuries were consistent with manual strangulation and were likely suffered in the last 24 hours.  A sexual assault exam also revealed that Catherine had suffered recent injuries to her

4

genitalia consistent with sexual trauma—including tears, bruising, and petechia (ruptured blood vessels).

When interviewed (at the hospital) by San Francisco Police Department Sergeant Andrea Creed, Catherine stated that West had strangled her during the assault. Sergeant Creed also interviewed West a few hours after his arrest. Portions of the interview recording were played for the jury. After he waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, West told Creed that he had consensual sex with Catherine (two or three times) but denied hitting (or otherwise injuring) her.

When West was photographed, he had a bandage on his neck and an abrasion on his shoulder. With respect to the apparent bloodstains on his shirt, West repeated the explanation about a cut to his hand. But no fresh wounds were seen on his hands.

Pursuant to Evidence Code section 1108, the trial court admitted a certified copy of West's 2003 conviction for forcible rape (Pen. Code, § 261, subd. (a)(2)).

**D.**

West testified, in his own defense, that he offered Catherine crack in exchange for sex. She agreed and invited him to her apartment. When he entered the apartment, he did not intend to assault Catherine. They both smoked crack, then West initiated sex, and Catherine agreed. West consensually penetrated Catherine twice but could not maintain an erection.

West testified that Catherine made fun of his inability to maintain an erection, they both smoked some more, and he drank some alcohol. At some point, Catherine demanded more drugs. Catherine told him that she was " 'going to hurt [him]' " and started to reach under the bed. West, who is a Vietnam combat veteran and has combat-related posttraumatic stress disorder, was in fear because he did not know what she was reaching for.

He "reacted" to the perceived threat by grabbing her hand. Then a "fight" ensued. West testified that Catherine was trying to scratch and bite him, and despite being in fear for his life, he was merely trying to restrain her. Although West admitted slapping Catherine two or three times, he testified that he never punched or strangled her. West eventually fell asleep and woke up when officers entered the apartment.

In rebuttal, additional portions of West's interview with Sergeant Creed were played for the jury. During that interview, West never mentioned having problems maintaining an erection, Catherine commenting about such dysfunction, Catherine reaching for something that made him fear for his safety, or that he had restrained Catherine in self-defense. West also made no attempt to explain his earlier statement (to Officer Garcia) that he and Catherine did not have sex.

### E.

The jury convicted West of one count each of forcible rape, sexual battery by restraint, and false imprisonment; two counts of assault with force likely to cause great bodily injury; and assault with intent to commit rape as a lesser included offense to count five—which was originally charged as assault with intent to commit sexual assault during a burglary (§§ 220, subd. (b), 460, subd. (a)). The jury also found true an allegation that West had been previously convicted of forcible rape, which made him eligible for punishment under the one strike law (§ 667.61, subds. (a), (c)(1), (d)(1)), as well as under the habitual sex offender law (§ 667.71, subds. (a), (c)(1)).

West was acquitted of the other charged offenses, including two additional counts of forcible rape (counts two and three),[3]

---

[3] An additional count of forcible rape (count four) was dismissed by the court, pursuant to section 1118.1, before deliberations.

6

making criminal threats (§ 422; count 10), and burglary (§ 459; count 16).

The trial court found true allegations that West had suffered three prior felony convictions—second degree robbery (§ 211) in 1987, first degree robbery (§ 212.5, subd. (a)) in 2003, and forcible rape in 2003. All three qualified as strikes under the three strikes law (§§ 667, subds. (d)-(e), 1170.12, subds. (b)-(c)). West was sentenced, on count one, to a prison term of 25 years to life pursuant to the habitual sex offender law (§ 667.71, subd. (b)), which was tripled to 75 years to life under the three strikes law (§§ 667, subd. (e)(2)(A)(i), 1170.12, subd. (c)(2)(A)(i)).

## DISCUSSION

### A.

West contends the trial court abused its discretion under Evidence Code section 352 by admitting evidence of his prior rape conviction under Evidence Code section 1108. He is wrong.

### 1.

Although evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts (Evid. Code, § 1101), the Legislature has created an exception to this rule in cases involving sexual offenses. (*Id.*, § 1108; *People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) When accused of a sex offense, Evidence Code section 1108 allows admission of evidence of the defendant's commission of other sex crimes to demonstrate the defendant's disposition to commit similar crimes. (*People v. Avila* (2014) 59 Cal.4th 496, 514–515.) The court has discretion, under Evidence Code section 352, to exclude the evidence if its probative value is *substantially* outweighed by the probability that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (Evid. Code, § 352; *Avila, supra*, at p. 515.) However, Evidence Code section 1108

7

evidence is presumed admissible.  (*People v. Loy* (2011) 52 Cal.4th 46, 62 (*Loy*).)

Like any ruling under Evidence Code section 352, the trial court's admission of uncharged sex offense evidence is reviewed for abuse of discretion.  (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)

**2.**

Before trial, defense counsel moved to exclude evidence of West's 2003 conviction for rape.  West argued the evidence was inadmissible testimonial hearsay because the previous complaining witness had since died and never been cross-examined.  West also asserted any evidence was neither admissible under Evidence Code section 1101, subdivision (b), nor under Evidence Code section 1108, because the 2003 rape was remote and dissimilar, and because admitting the evidence would lead to undue consumption of time and jury confusion.  The prosecutor filed a competing motion to admit the evidence under Evidence Code sections 1101, subdivision (b), and 1108.

After lengthy pretrial arguments and an Evidence Code section 402 hearing, the trial court admitted the fact of West's prior rape conviction, pursuant to Evidence Code section 1108, but only in sanitized form (the certified record of conviction).  The court excluded all evidence of the underlying conduct.  The People filed a motion to reconsider the latter ruling, which the trial court denied.

**3.**

The trial court did not abuse its discretion in admitting the fact of West's 2003 rape conviction.

West first contends that his prior conviction was wholly irrelevant because it was undisputed that he and Catherine had sex. The argument is specious.  It was the fact that West claimed

they had sex consensually, and denied using force (or threats of force) to overcome Catherine's will, that made the probative value of his prior conviction so high.  (See *Loy, supra*, 52 Cal.4th at p. 61 [" '[s]ection 1108 assists the jury's task by allowing the accused's sexual misconduct history to be considered for whatever light it might shed on [whether the conduct took place as the victim described it]' "].)

Similarity between sex crimes increases the probative value of uncharged sexual offense evidence.  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1287.)  However, unlike Evidence Code section 1101, subdivision (b), admissibility under Evidence Code section 1108 does not require a significant degree of similarity between charged and uncharged offenses.  (*People v. Merriman* (2014) 60 Cal.4th 1, 41.)  It is enough that both the charged and uncharged offenses are sex offenses as defined by Evidence Code section 1108.  (*People v. Jones* (2012) 54 Cal.4th 1, 50; *Loy, supra,* 52 Cal.4th at p. 63.)  Here, both the prior and current offenses involved forcible rape (Pen. Code, § 261, subd. (a)(2)), which means that they are sufficiently similar.  (See Evid. Code, § 1108, subd. (d)(1)(A); *Jones, supra,* at p. 50.)  Accordingly, the trial court properly presumed that the evidence was admissible.  (*People v. Cordova, supra,* 62 Cal.4th at p. 132.)

Nor did the trial court abuse its discretion by declining to exclude the evidence under Evidence Code section 352.  "In deciding whether to exclude evidence of another sexual offense under [Evidence Code] section 1108, 'trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as

9

admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' " (*People v. Story* (2009) 45 Cal.4th 1282, 1295.)

West fails to point to any circumstances that required the trial court to find the presumption in favor of admissibility had been overcome. It was appropriate for the trial court to admit the fact of West's prior conviction, under Evidence Code section 1108, without testimony about the underlying circumstances. (See *People v. Wesson* (2006) 138 Cal.App.4th 959, 968-969.) This did not make the uncharged offense wholly dissimilar or reduce its probative value to nil. (*Id*. at p. 969.) If West wished to emphasize the dissimilarity of his prior offense, he could have presented evidence on that issue. (See *ibid*.)

The prior rape was not too remote to demonstrate propensity simply because it occurred more than 10 years before the charged offense. (*People v. Branch* (2001) 91 Cal.App.4th 274, 284-285.) As the trial court noted, West was incarcerated during a significant part of the 11-year gap between the charged offenses and his conviction on the uncharged rape. This circumstance mitigates any potential remoteness. (See *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1106.)

"Evidence of previous criminal history inevitably has some prejudicial effect. But under [Evidence Code] section 1108, this circumstance alone is no reason to exclude it." (*Loy, supra*, 52 Cal.4th at p. 62.) Here, the evidence was presented in an efficient fashion and *without* any inflammatory detail. In fact, the circumstance that West had been convicted of the 2003 rape—having pled guilty to the charge—"strongly supports" its admission. (*Loy, supra,* at p. 61.) "His commission of those crimes had already been established and was thus certain, and [West] bore no new burden of defending against the charges. The jury would not be tempted to convict him of the charged crime to punish him for the earlier crimes." (*Ibid*.)

10

The record shows that the court carefully considered the evidence, appropriately found that the fact of West's prior rape conviction had significant probative value and took steps to minimize any confusion by excluding the conduct underlying his conviction. West fails to demonstrate the trial court abused its considerable discretion in admitting the evidence.

**B.**

West also argues that the prosecutor committed numerous instances of misconduct, and that such misconduct *in combination* with the purported evidentiary error was prejudicial. We have rejected the notion that the trial court abused its discretion in admitting West's prior rape conviction. We deem any prosecutorial error harmless.

**1.**

The United States Constitution is violated when a prosecutor's conduct is so egregious that it infects the trial with such unfairness as to make the resulting conviction a denial of due process. (*People v. Flores* (2020) 9 Cal.5th 371, 403.) A prosecutor's lesser misconduct will violate state law " ' "if it involves the use of deceptive or reprehensible methods to persuade the . . . jury." ' " (*Ibid.*)

**2.**

In addition to excluding all evidence of the underlying conduct of West's 2003 rape conviction, the trial court also ruled that, if West testified, the prosecutor could impeach him with three of his prior felony convictions, but that the convictions were to be sanitized and referred to only as "felony [convictions] of moral turpitude."

Despite these rulings, the prosecutor stated (in the People's opening statement): "[Y]ou are also allowed to consider prior sexual misconduct in this case. [¶] And you will hear that in 2003

11

Mr. West did suffer *convictions* for forcible rape, which is what he's charged with here, *as well as first-degree robbery*.  I will not ask you to convict him on that alone, but I will ask you to consider that as a factor when it's time."  (Italics added.)

At the conclusion of the prosecutor's statement and outside the presence of the jury, defense counsel objected, arguing that the prosecutor's reference to West's 2003 robbery conviction—both orally and in a Power Point slide shown to the jury—was in violation of the court's rulings.  The trial court agreed.  Although the trial court denied defense counsel's motion for a mistrial, it admonished the jury to disregard the prosecutor's reference to a 2003 robbery conviction.  Specifically, the trial court instructed the jury (as defense counsel requested):  "[Y]esterday during opening statements you heard the [prosecutor] . . . mention that the defendant had a conviction for a violation of a fi[r]st degree robbery.  This was in violation of a previous Court order. [¶] You are not to consider for any reason the first degree robbery.  Do not consider it for any reason whatsoever."

Later, while presenting the People's case in rebuttal, the Prosecutor played an unredacted portion of Sergeant Creed's interview with West that referenced him having been previously arrested and convicted.  Although the record before us does not include defense counsel's apparent objection or request for admonition, the trial court later admonished the jury:  "[D]uring a portion of the playing of the audio, a portion of the audio was inadvertently played, which indicated, along the lines of the inspector saying, and the truth is that you have been arrested and convicted.  That portion of the audio was inadvertently played.  However, that portion of the audio relates to evidence that you have already been presented in this case.  You are not to speculate to it being anything beyond that.  So I'm instructing you to not use that portion . . . for anything in any portion of your deliberation."

12

## 3.

West contends that, in the above instances, the prosecutor committed prejudicial misconduct by exposing the jury to prior conviction information that they otherwise would not have learned.

We agree that—by referring to West's 2003 robbery conviction—the prosecutor violated the trial court's pretrial evidentiary ruling, and thereby committed misconduct, regardless of whether the violation was intentional. (*People v. Friend* (2009) 47 Cal.4th 1, 33; *People v. Crew* (2003) 31 Cal.4th 822, 839.)

In the second instance of purported misconduct, the record is insufficient to demonstrate that West preserved his argument by raising a specific objection and requesting admonition. (See *People v. Dykes* (2009) 46 Cal.4th 731, 760 (*Dykes*) [" ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment *of misconduct and* requested that the jury be admonished to disregard the impropriety" ' " (italics added)].)  Nor does West demonstrate that objection may be excused because it would have been futile, or admonition would not have cured the harm. (*Ibid.*)

In any event, any error is harmless (whether considered individually or cumulatively) on the record before us.  A defendant's conviction will be reversed for prosecutorial misconduct if "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew, supra,* 31 Cal.4th at p. 839.)

First, in both instances, the trial court quickly gave admonitions that explicitly instructed the jury to disregard the prosecutor's references to any prior conviction other than the 2003 rape conviction.  With respect to the prosecutor's opening

13

statement, the trial court also repeatedly instructed the jury that "what the attorneys say is not evidence." We must presume that the jury followed these instructions "even where supposedly 'improper inflammatory attacks' are at issue." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 857, 861; *People v. Avila* (2006) 38 Cal.4th 491, 571-574.)

Second, the evidence against West was, if not overwhelming, very strong. " ' "Improper evidence of prior offense results in reversal *only* where the appellate court's review of the trial record reveals a closely balanced state of the evidence." ' " (*In re James B.* (2003) 109 Cal.App.4th 862, 875.) Even though the jury apparently did not believe the prosecution had proved West guilty (beyond a reasonable doubt) of burglary, making criminal threats, or of multiple counts of rape, this is not such a case.

Catherine's testimony (regarding the counts on which West *was* convicted) was corroborated by the accounts she gave to her neighbor, the 911 dispatcher, Officer Garcia, and Sergeant Creed.[4] Catherine's account was also corroborated by West's prior rape conviction and the physical evidence. On the other hand, West's testimony—that he and Catherine had consensual sex, that he was unable to maintain an erection, and that he thereafter only slapped Catherine and restrained her hand—is in conflict not only with the physical evidence but also with his own initial prior statements to police.

Third, neither fleeting reference to West's criminal history is particularly prejudicial when compared to the Evidence Code section 1108 evidence, which was properly admitted to show

_____

[4] Catherine was impeached with her prior arrest, in December 2013, for falsely identifying herself to a police officer. She also admitted her own history of violent behavior, including a conviction for misdemeanor domestic violence and an arrest for allegedly pulling a knife on a stranger on a bus.

West's disposition to commit sex offenses. Indeed, in his own appellate briefs, West maintains that the prosecutor's misconduct was prejudicial *only in conjunction* with the purported evidentiary error. Having already concluded that West's prior rape conviction was not admitted in error, we also decide that the impact of the prosecutor's brief reference to West's 2003 robbery conviction was negligible.

On this record, it is not reasonably probable the jury would have reached a more favorable result absent the prosecutorial error. For the same reasons, the trial court did not abuse its discretion in denying West's motion for a mistrial. (*People v. Ayala* (2000) 23 Cal.4th 225, 283 [standard of review].) West's chances of receiving a fair trial were not irreparably damaged. (*Ibid*.)

### 4.

West complains of other instances of purported prosecutorial misconduct, which we need not address in detail. We have reviewed the record surrounding each instance and conclude that, by failing to raise prosecutorial misconduct objections and request corresponding admonitions below, West forfeited these claims on appeal. (*Dykes, supra,* 46 Cal.4th at pp. 763, 766.) Furthermore, any misconduct was harmless (either considered alone or cumulatively) for the reasons stated above and because the trial court *sustained* other objections, gave requested admonishments, and/or granted motions to strike in every complained of instance. "A party generally is not prejudiced by a question to which an objection has been sustained." (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236; accord, *Dykes,* at p. 763.)

### C.

Next, West insists the trial court erred in denying his motion to continue sentencing so that he could prepare a motion

15

for discovery under the California Racial Justice Act of 2020 (Racial Justice Act; §§ 745, 1473, subd. (f), 1473.7, subd. (a)(3)). We disagree.

## 1.

Effective January 1, 2021, the Racial Justice Act permits a criminal defendant to challenge a conviction or sentence on the ground that it was obtained "on the basis of race, ethnicity, or national origin." (§ 745, subd. (a); Stats. 2020, ch. 317, § 3.5.) "The Act sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147 (*Young*).) A defendant may establish a violation by proving, by a preponderance of the evidence, that "[a] longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, . . . than on defendants of other races, . . . in the county where the sentence was imposed." (§ 745, subd. (a)(4)(A).)

The statute also provides a discovery mechanism: "A defendant may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state. A motion filed under this section shall describe the type of records or information the defendant seeks. Upon a showing of good cause, the court shall order the records to be released." (§ 745, subd. (d).) "[I]n order to establish good cause for discovery under the Racial Justice Act, a defendant is required only to advance a plausible factual foundation, based on specific facts, that a violation of the Racial Justice Act 'could or might have occurred' in his case." (*Young, supra,* 79 Cal.App.5th at p. 159.)

"[A]lthough the plausible justification standard is 'minimal,' it must still be 'based on specific facts.' [Citation.]

Thus, preparing a discovery motion under the [Act] necessarily entails a fairly thorough review of the trial record for any remarks or conduct by the trial judge, attorneys, experts, jurors, and law enforcement officers that may plausibly support the conclusion that a . . . violation ' "could or might have occurred" in [the] case.' " (*People v. Garcia* (2022) 85 Cal.App.5th 290, 297 (*Garcia*).)

Continuances of any criminal hearing "shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) "Whether good cause exists is a question for the trial court's discretion *but requires at a minimum that the party seeking continuance demonstrate it has prepared for the hearing with due diligence*." (*People v. Johnson* (2013) 218 Cal.App.4th 938, 942, italics added.) The party challenging the trial court's continuance ruling bears the heavy burden of establishing an abuse of discretion. (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

**2.**

The jury returned its verdicts on August 30, 2021. About five weeks later, on October 5, 2021, the trial court found West's prior conviction allegations true, and set West's sentencing hearing for December 10, 2021—over the People's objection that delaying sentencing was unfair to Catherine. In doing so, the trial court cautioned West: "I have agreed . . . to give you a little additional time, based on [defense counsel's] concerns [about your age and COVID-19 conditions at San Quentin], and . . . based on the amount of research and information that will be necessary to provide a thorough sentencing memorandum. . . . I need you to understand that [December 10] is the date for sentencing. [¶] . . . [¶] . . . [I]f you do not appear on that date, I will proceed with the sentencing without you being present."

In its presentencing report (received on October 27, 2021), the probation department recommended West be sentenced to an aggregate term of 176 years and four months to life. Sentencing

17

was continued, on West's request, to January 28, 2022, and then to February 10, 2022. In the interim, the People filed their sentencing memorandum, on January 19, 2022, which requested imposition of an aggregate sentence of 76 years and four months to life.

In his sentencing brief, West asked the trial court to dismiss or strike all three of his prior strikes, pursuant to section 1385 and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). West also argued that imposition of the life sentence mandated by either the one strike law or the habitual sex offender law—or any sentence that totaled more than 20 years— would constitute cruel and unusual punishment given his age (68) at that time.

Two days before the date then set for sentencing, the trial court issued its tentative ruling—indicating the court's intent to sentence West to an aggregate term of 75 years to life. On February 10, 2022, West refused to appear at the sentencing hearing. Sentencing was once again continued to March 3, 2022. West was again ordered present, and counsel was ordered to notify him that sentencing would proceed in his absence if he did not voluntarily appear on that date.

A little more than a week before the sentencing hearing, defense counsel filed a motion for continuance, in which West— who is African American—requested six weeks to "investigate . . . [racially] disparate sentences." The People opposed the continuance request, noting that sentencing had now been set and continued several times—at great emotional cost to Catherine. The prosecutor also maintained that defense counsel had over five months to file a motion for discovery and did not present a reasonable excuse for delaying the filing.

The trial court denied West's motion to continue sentencing—on the grounds that it was untimely and unsupported by good cause. Sentencing went forward as

18

calendared, on March 3, 2022, after West waived his personal presence (§§ 977, subd. (b), 1043, subd. (d)).

At sentencing, the trial court partially granted West's *Romero* motion and dismissed the strike for the 2003 robbery, but otherwise denied the motion. Because West had been previously convicted of forcible rape in 2003, the trial court determined that his sentence on count one was 25 years to life, under the habitual sexual offender law (§ 667.71, subds. (a), (b), (c)(1)) and stayed his sentence under the one strike law (and remaining counts). (See *People v. McQueen* (2008) 160 Cal.App.4th 27, 38.) The trial court tripled the 25-years-to-life term under the three strikes law (§§ 667, subds. (d)-(e), 1170.12, subd. (c)(2)(A)(i)) due to its previous findings that he had suffered two prior strikes.

**3.**

The trial court did not abuse its discretion by denying West's request for a continuance.

Defense counsel did not present a reasonable excuse for delaying the filing of a motion for discovery approximately five months after entry of the jury's verdicts. In her declaration, defense counsel stated that she began looking into a claim under the Racial Justice Act after receiving the trial court's indicated sentence, on February 8, 2022. Defense counsel stated that, although it already had information suggesting a racially disparate pattern of arrests and charging for sex crimes in San Francisco, the defense needed more time to investigate racial disparity in sentencing.

This was not sufficient to establish due diligence. After all, the Racial Justice Act had been enacted more than a year earlier. (Stats. 2020, ch. 317, § 3.5.) And defense counsel had known of West's vulnerability to an extremely long three strikes sentence for approximately five months. The trial court's sentencing discretion was limited. (See §§ 667.61, subds. (a), (g), 667.71,

19

subds. (b), (d); *People v. Vargas* (2014) 59 Cal.4th 635, 641; *People v. Hammer* (2003) 30 Cal.4th 756, 761; *People v. Murphy* (2001) 25 Cal.4th 136, 159–160; *People v. Snow* (2003) 105 Cal.App.4th 271, 281, 283.) Despite all this, defense counsel chose not to pursue discovery under the Racial Justice Act until immediately before the sentencing hearing, after the hearing had already been repeatedly delayed.

Additionally, in California, victims have a right to a prompt conclusion of the case. (Cal. Const., art. I, § 28, subd. (b)(9); § 679.02, subd. (a)(10).) By the time of the continued sentencing hearing, more than seven years had elapsed since the commission of the charged offenses. On this record, the trial court acted well within its discretion in denying West's motion for a continuance. (See *People v. Alexander* (2010) 49 Cal.4th 846, 935.)

West's reliance on *Garcia, supra*, 85 Cal.App.5th 290 is misplaced. In *Garcia*, our colleagues in division three reversed a trial court order denying a continuance of sentencing that was requested, in part, for investigation of a Racial Justice Act claim. (*Id.* at pp. 294, 297.) In that case, new counsel was appointed for the defendant on remand for resentencing. And counsel had less than a week after her appointment "to familiarize herself with the case, prepare the sentencing brief, and marshal facts for and prepare a motion for discovery under the [Racial Justice Act]." (*Id.* at p. 297.) The *Garcia* court concluded that the one-week period was insufficient and that the "defendant should have been given a reasonable opportunity to review the trial record and gather relevant information to prepare a motion for discovery." (*Ibid.*)

Here, in contrast, defense counsel was not new to the case and had approximately five months to prepare and file a motion for discovery, or to otherwise advance the requisite "plausible factual foundation" for a claim under the Racial Justice Act. (*Young, supra*, 79 Cal.App.5th at p. 159.)

20

## D.

West also maintains that the trial court abused its purported discretion, under recent amendments to section 1385, by tripling his 25-years-to-life term on count one. He is wrong.

## 1.

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) amended section 1385 to add subdivision (c). (Stats. 2021, ch. 721, § 1; *People v. Olay* (2023) 98 Cal.App.5th 60, 64.) Section 1385, subdivision (c)(1) provides: "Notwithstanding any other law, the court *shall* dismiss an *enhancement* if it is in the furtherance of justice to do so, except if dismissal of that *enhancement* is prohibited by any initiative statute." (Italics added.) Section 1385, subdivision (c)(2) provides that, in determining whether to dismiss an enhancement "under this subdivision," the court must "consider and afford great weight to" nine listed mitigating circumstances if proven by the defendant (*id.*, subds. (c)(2)(A)–(I)), "unless the court finds that dismissal of the *enhancement* would endanger public safety." (*Id.*, subd. (c)(2), italics added.) One of the mitigating circumstances is: "The application of an *enhancement* could result in a sentence of over 20 years. In this instance, the *enhancement shall* be dismissed." (*Id.*, subd. (c)(2)(C), italics added.)

West argued, in his sentencing brief, that dismissal of all three of his strikes was required under section 1385, subdivision (c)(2)(C). The People disagreed.

## 2.

Although West concedes that the trial court exercised its preexisting *Romero, supra*, 13 Cal.4th 497 discretion to dismiss one of his strikes (for the 2003 robbery conviction), West argues (as he did in his sentencing brief below) that—absent a showing that it would endanger public safety—dismissal of all three of his strikes was required under section 1385, subdivision (c)(2)(C). In

other words, he insists that the trial court necessarily abused its discretion by declining to dismiss the remaining prior strike allegations under section 1385, subdivision (c)(2)(C). The People have the better argument.

This division recently held, after extensive review of Senate Bill No. 81's legislative history, that section 1385, subdivision (c), does not apply to this situation because the three strikes law is an alternative sentencing scheme, not an enhancement. (*People v. Olay, supra,* 98 Cal.App.5th at pp. 67, 69; accord, *People v. Burke* (2023) 89 Cal.App.5th 237, 242-244 ["plain language of subdivision (c) of section 1385 applies only to an 'enhancement,' and the Three Strikes law is not an enhancement"].) West presents no reason for us to reconsider that ruling. Accordingly, West fails to show any abuse of discretion.

## DISPOSITION

The judgment is affirmed.

BURNS, J.

WE CONCUR:

JACKSON, P. J.
CHOU, J.

*People v. West (A164873)*